IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

MARCUS STARKS;
APRIL STARKS                                                                PLAINTIFFS

VS.                                             CAUSE NO. 3:15-cv-00094-MPM-SAA

DEPUTY AUSTIN KEYS, BADGE #27,
in his individual capacity                                                  DEFENDANT

JURY TRIAL DEMANDED

---

PLAINTIFFS' BRIEF IN SUPPORT OF RESPONSE
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

Plaintiffs have filed suit under the Fourth Amendment and 42 U.S.C. §1983 against Deputy Keys [Doc. 1,] alleging that he detained them at a traffic stop for an unreasonable time (35 minutes) for issuance of a minor traffic violation citation (failure of driver Marcus Starks to use his seatbelt). Keys has filed a motion for summary judgment [Doc 12], pursuant to *Rule 12(b)(6)*, or *Rule 56, Federal Rules of Civil Procedure*, claiming he is shielded by qualified immunity from suit because the length of the stop was objectively reasonable under the circumstances.[1]

---

[1] By submitting numerous evidentiary exhibits in support of his motion, it appears that Defendant has converted his Rule 12 (b) (6) motion to dismiss into a motion for summary judgment. Therefore, the analysis by the court should be a Rule 56 analysis. Rule 56 provides that, " The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

1

The traffic stop was a warrantless seizure for a traffic violation committed in the presence of the officer who wrote the citation for "no seat belt". The initial stop, therefore, was justified. However, detention beyond that necessary to complete the routine tasks relating to writing a ticket for a minimal traffic violation, was not justifiable under the circumstances because the responding officers did not discover any objective basis for further investigative detention.

**UNDISPUTED FACTS KNOWN TO DEPUTY KEYS AT AND DURING THE TIME OF THE TRAFFIC STOP:**

It is undisputed that Deputy Keys stopped the Starks vehicle, a 2006 Chrysler 300, at or about 2020 hours (8:20 p.m.) alongside a highway (Fitzgerald Boulevard) in Tunica County on October 24, 2014, after having seen at a lighted intersection that the facing driver, Marcus Starks, was not wearing his seat belt (D-B and E). As Deputy Keys turned around and followed the vehicle, he noted there were four individuals inside. Therefore, for security reasons he waited until the vehicle was in a lighted area before stopping it. Id. Once the vehicle pulled over and stopped, Keys approached and learned there were two men and two women inside. Marcus Starks, erroneously referred to as Marvin Starks in the defense brief, was the driver. Marvin Starks, the brother of Marcus, sat in the back seat with his wife, Crystal Harmon (P-3, 4 and 5, Declarations of Marcus Starks, April Starks and Crystal Harmon, respectively). To avoid confusion Marcus and Marvin will be referred to by their first names throughout this brief. Marcus provided his driver's license to Keys for inspection (P-3, ¶ 6).

2

(Whether he promptly did that, or refused until the shift supervisor arrived, is disputed. Marcus, April Starks and Crystal Harmon all assert in their Declarations that Marcus did provide his license to Keys upon request (P-3, 4 and 5). Keys in his Affidavit says Marcus complained that his rights were being violated by Keys' asking for his driver's license, but is silent as to whether Marcus produced it upon request ( D -E, ¶ XII.). This is also true of Keys' incident report (D-B). Deputy Anfrenee Omar Saffold says in his Affidavit that Marcus refused to turn over his driver's license prior to the arrival of Captain Felix (D-F, ¶ III.). Deputy Angela White says in her Affidavit that she tried to check the identification of the **other** occupants of the vehicle, but is silent on the issue of whether Marcus refused to allow a check of his ( D-G, ¶ III). However, she later notes that all occupants' licenses were checked after the arrival of Captain Felix ( D-G ¶ VIII.). She also notes that they all came back without outstanding warrants.) Despite the dispute as to when Marcus produced his license, it is undisputed that the license was legitimate and current and the check did not disclose any outstanding warrants.

      Deputy Keys wrote out a citation (D-A) and handed it to Marcus, while also stating he wanted to run the driver's licenses of the passengers, as well as that of Marcus (P-3, Declaration of Marcus Starks, ¶¶ 7-10); (D-E, Affidavit of Markendrick Keys, ¶ XII. ) .[2] Marcus objected, saying that he did not believe the officer had the right to do that. Keys insisted that he did have the right. Marcus said he wanted to ask Keys' shift supervisor if that was true (P-3, ¶¶ 7-10).

---

[2] The parties agree that the correct first name of Defendant Keys is Markendrick.

3

Another deputy who had arrived on the scene called the shift supervisor, who was busy at the moment but agreed to finish up and go to the scene of the traffic stop. After the duration of about 22 minutes since the stop, the shift supervisor arrived (D-C, entry 2042), and confirmed Keys' view that he had the right to check on the driver's licenses of each passenger (D-H, ¶ V.). In compliance the passengers handed over their driver's licenses which were then checked by a dispatcher at the Tunica County Sheriff's Office. The shift supervisor then reported that none of the searches turned up an outstanding warrant. P-3, ¶ 22; D - H). The Starks party was then allowed to leave after being held for a period of about 35 minutes. Id.

Marcus, April Starks and Crystal Harmon all attest that no discussion about the Chrysler's license plate occurred during the stop ( P 3, 4 and 5). In addition, no reference to the license plate was made in Keys' incident report (D-B), or in any of the deputies' affidavits, including Keys', in support of the motion for summary judgment ( D-E, F, G and H).[3]

## FACTS LEARNED BY MARCUS STARKS ABOUT TWO MONTHS AFTER THE TRAFFIC STOP AT ISSUE IN THIS CASE.

While driving his Chrysler 300 in Horn Lake, Mississippi, about two months later, in December, 2014, Marcus Starks was again stopped by a police officer, who noticed that his license plate design had expired even though the

---

[3] Although the Defense brief includes several references to Keys allegedly relying on the dispatched information at 2020 hours that the Starks tag was actually registered to a different vehicle owned by different people (D-C), the writer fails to cite a single evidentiary item to support the defense position that Keys relied on that entry, or any other evidence that Keys had knowledge of a tag discrepancy at the time of the traffic stop.

4

sticker on the plate was current. The officer charged Marcus with using a switched tag ( P-3, ¶ 27).  Prior to his trial date on that charge  Marcus investigated the matter at the Desoto County Tax Collector's Office and learned that an employee of that office had erroneously given him a license sticker or decal when she should have given him a replacement license plate.  Marcus obtained the correct plate, DCP 877, and at court on April 7, 2015 the court dismissed the charge with the comment, "...was issued in error by the tax office." ( P-3 and collective P-2).

**FACTS LEARNED BY THE DEFENSE *AFTER* THE TRAFFIC STOP AND RELEASE OF THE STARKS PARTY AND VEHICLE:**

At some time apparently after the conclusion of the traffic stop, and probably not prior to the filing of this lawsuit, someone read the dispatcher's contemporaneous notes of the stop, including the result of his having run a computer check on the Chrysler's license plate, Desoto County, Mississippi  plate DEC 471.  That information was presented to defense counsel, as indicated by the quoted dispatch notes at the top of page 2 of the defense brief in support of the summary judgment motion.  Those notes indicate that license plate DEC 471 was registered to  a different vehicle belonging to two individuals who were not in the Starks vehicle. This information was true, but misleading, as will be discussed below.

**KEY FACTS UNKNOWN TO BOTH THE PLAINTIFFS AND THE DEPUTIES AT THE TIME OF THE TRAFFIC STOP AND THEREAFTER PRIOR TO THE FILING OF THE MOTION FOR SUMMARY JUDGMENT:**

5

Upon learning about the dispatcher's notes concerning his license plate, DEC 471, after receiving the motion for summary judgment, Marcus Starks revisited the history of his license plates at the office of the County Tax Collector. As shown in his Declaration, P-3, and Collective P- 2 [2 pages]), the plate DEC 471 was indeed the plate issued to him at the time of his purchase of the vehicle in 2009, and which at the time of the traffic stop was still displayed on the vehicle. On July 11, 2014, he should have received a new license plate numbered DCP 877, but the office employee erroneously gave him only an updated decal instead (Collective P-2). Thus, he retained license plate DEC 471, but with a new decal. The proper, but erroneously undelivered tag had an expiration date of April 30, 2015. When he was stopped by Defendant Keys on October 24, 2014, Marcus was still unknowingly displaying an obsolete tag, albeit with a current decal.

Obviously, no one discovered this at the time of the traffic stop at issue, and Marcus was allowed to leave with just a citation for "no seatbelt".[4] Meanwhile, Marcus' old tag number of DEC 471 had been reassigned to a different vehicle owned by two other people, as reflected in the dispatcher's notes (D-C, entry at 2020). Marcus did not discover the problem until later when he was stopped by the Horn Lake officer, as described above. Because of that stop and a citation for "switched tag", He went to the tax collector's office, learned what had happened, finally received the correct tag and obtained dismissal of the

---

[4]It strains the imagination to believe Keys would knowingly fail to charge a switched tag, if he had been aware of it. In any event none of the evidentiary documents produced by the defense support such awareness.

"switched tag" charge (P-3 and (P-1).

## ARGUMENT

## THE DEFENDANT VIOLATED THE STARKS PARTY'S FOURTH AMENDMENT RIGHTS BY DETAINING THEM BEYOND A REASONABLE TIME TO COMPLETE A CITATION PROCEDURE FOR A SEAT BELT VIOLATION ON THE DRIVER, MARCUS STARKS, AND BY RUNNING A LICENSE CHECK ON EACH PASSENGER.[5]

It is undisputed that Defendant Keys insisted he had a right to run the driver's licenses of all passengers, not just the driver's license of Marcus Starks. It is also undisputed that no specific ground for assertion of that alleged right was disclosed to the members of the Starks party during the traffic stop, either by Keys or by his shift supervisor, Captain Monolito Felix, who ordered that the license checks proceed before allowing the Starks party to leave. Felix's comment after the passengers' licenses were run that all came back with no outstanding warrants (D-H ¶ V.) gives rise to a reasonable inference that the intention to run all licenses was to learn if any occupant had an outstanding warrant, and yet the deputies had developed no objective basis for suspecting that any of them had outstanding warrants, or that any of them had criminal records. Also, notably, none of the deputies, including Keys, who have submitted affidavits in support of the motion for summary judgment have ventured to suggest any other reasonable rationale for holding the group beyond the time necessary to write a citation for a

---

[5]The Amended Complaint also alleges a wrongful stop in violation of the Fourth Amendment. However that claim will be voluntarily dismissed.

seat belt violation and to check the driver's license status of Marcus Starks, the driver.

"Traffic stops are considered seizures within the meaning of the Fourth Amendment." *U.S. v. Banuelos-Romero,* 597 F.3d 763, 766 (5th Cir. 2010) (*citing U.S. v. Grant,* 349 F.3d 192, 196 (5th Cir. 2003)". "Stopping a motor vehicle and detaining its occupants, even for a moment, is a seizure for Fourth Amendment purposes." *City of Indianapolis v. Edmond,* 531 U.S. 32, 40 (2000); *Whren v. U.S.,* 517 U.S. 806, 809-10 (1996). A routine traffic stop is more like a brief stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed2d 889, than an arrest. *Knowles v. Iowa*, 525 U.S. 113, 112. Its tolerable duration is determined by the seizure's 'mission', which is to address the traffic violation that warranted the stop and attend to related safety concerns. *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842(2005). " Authority for the seizure ends when tasks tied to the traffic infraction are–or reasonably should have been–completed. The Fourth Amendment may tolerate certain unrelated investigations that do not lengthen the roadside detention (citations omitted), but a traffic stop become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." *Rodriguez v. U.S.*, __U.S.__, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015). The point of *Terry* and its progeny is that the permitted brief stop must not be expanded to allow seizures and searches for general criminal investigations where no objective facts exist for a reasonable suspicion of criminality. Here, Deputy Keys sought to conduct a general criminal investigation of the passengers by seizing and searching their driver's license records to determine if they had outstanding warrants. That purpose far exceeds the permissible checking of the driver's license of Marcus to ensure compliance

8

with the traffic laws. Keys' insistence on (unlawfully) running the passengers' driver's licenses impermissibly expanded the scope of the stop. The delay resulting in a total of 35 minutes' detention was caused, not by Marcus Starks' reasonable challenge to Deputy Keys' demand for his passengers' licenses, but by the unlawful demand, itself. The Plaintiffs should not be assigned responsibility for a delay caused by a denial of their Fourth Amendment right to be free from unreasonable seizure and search, *Terry v. Ohio*, 392 U.S. 1 (1968). Furthermore, the other occupants of the Starks vehicle and Marcus, himself, dispute the defense claim that Marcus refused to submit his driver's license to Keys at the outset, thereby creating a genuine issue of material fact for submission to the jury, and nullifying the Defendant's claim of qualified immunity. In fact it is undisputed that the Starks vehicle began rolling because Marcus started to reach in his hip pocket for his wallet (and his driver's license) while forgetting to put the gear in park. That gesture corroborates the Starks party's declarations that Marcus complied with the Keys request for his driver's license.

**LEGAL STANDARD:**

The analysis applicable to all warrantless searches and seizures is applicable to a detention extended beyond the time necessary time to write a citation for a simple traffic violation. Warrantless searches and seizures, often called 'investigatory stops,' are permissible 'only if based on reasonable suspicion that criminal activity is afoot." *U.S. v. Wali*, 811 F.Supp.2d 1276, 1280 (N.D.Tex. 2011), citing *U.S. v. Martinex*, 486 F.3d 855, 859 (5th Cir. 2007). No such reasonable suspicion surfaced at the time of the stop in this case.

## THE PLAINTIFFS HAVE DEMONSTRATED GENUINE ISSUES OF MATERIAL FACT REQUIRING RESOLUTION BY A JURY:

The prolongation of the stop was caused entirely by the unjustified insistence of Defendant Keys, later approved by Captain Felix, that he had a right to detain all of the Starks party and invade the privacy of the passengers by running all of their driver's licenses to determine whether any of them had outstanding warrants, even though the deputies had failed to establish any objective basis for that unrelated investigation. The extended detention and searches were impermissible under the Fourth Amendment. A traffic stop prolonged beyond the time in fact needed for the officer to complete his traffic-based inquiries is "unlawful". *Caballes, supra*, 543 U.S. at 407, 125 S.CT. 834, 160 L.Ed. 2d 842. A police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation "becomes[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a ticket for the violation. *Id.*

## QUALIFIED IMMUNITY:

Defendant Keys seeks judgment in his favor on the ground of qualified immunity, an affirmative defense. " When an officer argues that he is entitled to qualified immunity from suit, [the court] first view[s] the evidence in the light most favorable to the party asserting the injury and decide[s] if the facts alleged show the officer's conduct violated a constitutional right.'" *Mesa v. Prejean*, 543 F.3d 264, 269 (5th Cir. 2008) (*citing Saucier v. Katz*, 533 U.S. 194, 201 (2001). To overcome the claim of qualified immunity , a plaintiff must make a showing "(1)

that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011) (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

### Violation of a Constitutional Right:

Plaintiffs have established above that a seizure and search pursuant to the traffic stop at issue triggered the Fourth Amendment protections against *unreasonable* searches and seizures . The Fourth Amendment protects the passengers, as well as the driver of the vehicle. See,. *Brindlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 168 L.Ed. 2d 132 (2007). The insistence by Deputy Keys that he had a right to run each of the passengers' licenses impermissibly converted the detention from a traffic stop into a general criminal investigation without reliance on any objective facts supporting a reasonable suspicion of criminality.

### Clearly Established Right:

Plaintiffs have cited ample case law above, dating back to *Terry,* that a mere traffic stop may not, as here, be expanded into an unrelated criminal investigation without offending the Fourth Amendment. In *Caballes, supra*, The Fifth Circuit Court of Appeals has clearly followed the U.S. Supreme Court precedent*s*. It was clearly established by both Supreme Court and Fifth Circuit precedents long before the traffic stop in this case that the purpose of a traffic stop could not be expanded beyond matters relating to issuance of the ticket in the absence of suspicion based on objective facts that criminal activity was afoot.

## AFTER- ACQUIRED INFORMATION MAY NOT BE USED TO JUSTIFY AN EARLIER SEIZURE AND SEARCH:

An officer may not justify a prolongation of a permissible detention by after-acquired information. See, e.g., *U.S. v. Wali,* 811 F.Supp.2d 1276, 1281 (N.D. Tex. 2011). The defense places heavy reliance on the Tunica County Sheriff's Office dispatch log (D-C), to support its claim that 1) Marcus Starks was responsible for the delay because he requested the opportunity to speak to the shift captain, who at first was busy elsewhere; and 2) that the check on the car tag indicated that it was assigned to a black 1990 ford, registered to Aaron Worhorst or Sandra Irby, not to the vehicle owned and driven by Plaintiff Marcus Starks.

The Plaintiffs have argued above that the delay was caused by the unlawful demand of Defendant Keys to run the driver's licenses of the passengers and the extended detention caused by their refusal to allow the unlawful intrusion. Plaintiffs also deny in their Declarations that Marcus refused the request of Keys to run his driver's license. Therefore, Plaintiffs will not rehash those arguments here, other than to repeat that the Plaintiffs have demonstrated genuine issues of material fact on these points and reiterating that at this stage the facts must be viewed in the light most favorable to the nonmovant Plaintiffs.

Regarding the second ground, the tag information relayed by the dispatcher, Plaintiffs have shown that the information was misleading due to an error in the Tax Collector's Office. An employee in that office issued Marcus a current year decal, rather than an actual new license plate, as required in July, prior to the October 24, 2014 traffic stop. Marcus Starks did not switch a car tag and did not knowingly commit a traffic violation or criminal offense. The charge against him in the Horn Lake, Mississippi Municipal Court was dismissed because of the

error in the tax office.

Notwithstanding the innocence of Marcus Stark of the switched tag charge, Plaintiffs concede that if that information had been discovered by the deputies at the time of the stop, they would have been justified in good faith in pursuing a criminal investigation against Marcus and perhaps even impounding his vehicle.

However, as noted above in detail, it is patently obvious that the dispatch was not read, and therefore certainly not relied upon to justify a demand to run the driver's licenses of the passengers. Neither the deputies nor the Starks party ever became aware of the dispatch, even up to the court action on the "no seatbelt" charge.

It appears that the dispatch came to light only because this lawsuit was filed. It is unthinkable that Deputy Keys or Captain Felix would have ignored that information if they had been aware of it. However, the dispatch obviously got lost in the confusion of the moment. Although the defense expounds at length on the importance of the contemporaneous dispatcher notes, and at page 7 of the Defendant's brief, assumes as true that Keys saw the dispatch before taking action, that assertion is not supported by Keys' incident report or his Affidavit, or those of the other deputies, or any other evidentiary submission. On the contrary, Plaintiffs' Declarations underscore that the issue of the tag never arose during the stop, or before the filing of the motion for summary judgment by the Defendant. At no point does the defense credibly claim that the notes at issue were known to any of the deputies at the scene. Furthermore, it speaks volumes on this point, that Deputy Keys was silent about the dispatch in his incident report written on the date of the stop.

## CONCLUSION

The Defendant's Motion for Summary Judgment should be denied because the Plaintiffs have submitted authoritative, binding case law that the Defendant violated Plaintiff's clearly-established rights under the Fourth Amendment by demanding that the passengers allow their driver's licenses to be run and prolonging the detention of all persons in the Starks vehicle until they complied with that unlawful demand. The Plaintiffs further submit that they have presented genuine issues of material fact concerning the timing of Marcus Starks' submission of his driver's license to Defendant and concerning whether the Defendant was aware of the dispatched information about the Starks vehicle license plate at the time of the traffic stop.

                    **RESPECTFULLY SUBMITTED,**

                            **MARCUS STARKS**
                            **APRIL STARKS**

                    **BY:** */s/ Ronald W. Lewis*
                        **RONALD W. LEWIS**

## CERTIFICATE OF SERVICE

I, Ronald W. Lewis, certify that I have filed the foregoing Brief in Support of Response to Motion for Summary Judgment, using the Court's ECF system, which then automatically provided notice of filing to all interested parties.

This, the 22nd Day of September, 2015.

/s/Ronald W. Lewis
RONALD W. LEWIS