IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**MARCUS STARKS and**
**APRIL STARTKS** **PLAINTIFFS**

v. Civil Action No.: 3:15-cv-00094-MPM-SAA

**DEPUTY AUSTIN KEYS,**[1] **Badge #27,**
**In his individual capacity,** **DEFENDANT**

**MEMORANDUM OPINION GRANTING DEFENDANT'S MOTION**
**FOR SUMMARY JUDGEMENT [12]**

This matter comes before the Court on the *Motion for Summary Judgment* (the "Motion") [12], filed on August 25, 2015 by defendant Deputy Markendrick X. Keys[2] (the "Defendant"), an officer of the Tunica County Sheriff's Department. On September 22, 2015, plaintiffs Marcus and April Starks (the "Plaintiffs") filed their *Response to Defendant's Motion for Summary Judgment* (the "Response") [17]. Defendant thereafter filed his *Rebuttal to Plaintiffs' Response to Defendant's Motion for Summary Judgment* (the "Reply") [20] on September 28, 2015.

This case was commenced with the filing on the *Complaint* [1] on June 11, 2015,[3] wherein the Plaintiffs allege that the Defendant conducted an unlawful stop and extended detention, without reasonable, articulable suspicion, based on concrete facts or probable cause. Plaintiffs contend that the Defendant's actions constituted an unreasonable seizure and false imprisonment, all in violation of Plaintiffs' Fourth and Fourteenth Amendment rights.[4] [3].

---

[1] Although named in the Complaint as Deputy Austin Keys, the parties agree that the officer in question is actually Tunica County Sheriff's Deputy Markendrick X. Keys. [12].

[2] *See footnote 1*.

[3] A *First Amended Complaint* [3] was later filed on June 26, 2015.

[4] The Fourteenth Amendment provides, in part, that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

1

Plaintiffs further allege that as a result of the violation of their Constitutional rights, they have suffered "fear, emotional anguish, public humiliation, anger, inconvenience and loss of freedom." [3]. Plaintiffs seek compensatory and punitive damages, as well as attorney fees, litigation expenses, and court costs pursuant to 42 U.S.C. § 1988. Through the Motion, Defendant has raised his right to qualified immunity, shielding him as a government official from liability for civil damages insofar as his conduct does not violate clearly established statutory or constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The Motion and the suit itself is predicated on whether Defendant violated clearly established rights of the Plaintiffs, or whether the length of the traffic stop in question was objectively reasonable.

The Court has considered the Motion, Response, and Reply, as well as the relevant filings and case and statutory law, and finds that the Motion is due to be granted.

## I. JURISDICTION

Jurisdiction of this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1343. Venue in this Court is appropriate under 28 U.S.C. § 1391(b).

## II. FACTUAL BACKGROUND

The following summary of facts is taken from the parties' respective pleadings.

**A. Facts Not in Dispute**

On October 24, 2014, Defendants, together with Marcus's brother and sister-in-law, Marvin and Crystal Starks, were traveling through Tunica County, when they were stopped by

---

U.S. Const. amend. XIV. In short, the Fourteenth Amendment makes the provisions of the Fourth Amendment applicable against state law enforcement agents such as the Defendant.

the Defendant at approximately 8:20 P.M.[5] Plaintiff Marcus Starks was driving the vehicle at the time of the stop. Two officers – Defendant Keys and another deputy – effectuated the traffic stop. Deputy Keys informed Marcus Starks that he had been stopped for a seatbelt violation, and asked for his identification.[6] Although the location where the actual stop took place was not well-lit, the parties agree that Deputy Keys witnessed Marcus Starks not wearing his seatbelt when the Plaintiffs drove through a lighted intersection. [18]. The parties do not dispute that the traffic stop constituted a warrantless seizure for a traffic violation committed in the presence of an officer, and that the initial stop was, therefore, justified. *Id*. The parties also agree that at the time the stop was initiated, Marcus Starks pulled over as directed, but forgot to place the car in park, thereby causing it to roll forward as the officers were approaching. This prompted the officers to shout to Marcus to stop the vehicle, which he did.

During the stop, Deputy Keys asked the other passengers to show their identification, to which the passengers raised questions and protest. [17, Ex. 4, Affidavit of April Starks]. The passengers asked why they were required to provide their identification, to which Deputy Keys failed to give what Plaintiffs deemed to be a sufficient, explanatory answer. *Id.* Plaintiffs requested to talk to the shift supervising officer, later identified as Captain Monolito Felix of the Tunica County Sheriff's Department. *Id.* Another deputy who arrived on the scene, Deputy White, called the shift supervisor.

---

[5] In the Amended Complaint, the Plaintiffs originally estimated the time of the stop to be at 9:30 P.M. [3]. However, the radio station log submitted by the Defendant in support of the Motion lists the stop as taking place at 8:20 P.M.. [13, Ex. C]. In the Response, Plaintiffs state that it is "undisputed that Deputy Keys stopped the Starks vehicle…at or about 2020 hours (8:20 p.m.)…" [18].

[6] It is subject to dispute whether Marcus Starks presented his license to the Defendant before or after Captain Felix arrived on the scene. In their sworn affidavits, Marcus Starks, April Starks and Crystal Harmon (the vehicle occupants), all state that Marcus did present his license to the Defendant upon request. [17, Ex. 3, 4, and 5]. The affidavit of Deputy Keys says that Marcus complained of his rights being violated when asked for his license, but does not state whether or not Marcus produced the license. [12, Ex. D]. Despite the dispute as to when Marcus produced his license, it is undisputed that the license was legitimate and current and the check did not disclose any outstanding warrants.

The Defendant's affidavit states that Captain Felix arrived on the scene at approximately 11:00 P.M.. Captain Felix confirmed that the Defendant did have the right to check the driver's licenses of all passengers, at which point the passengers presented their identification. None of the passengers' license searches revealed an outstanding warrant. The passengers were then allowed to leave without citation, though they assert that they were so upset about the interaction that they decided not to proceed to their original, intended destination, but instead returned home. [3]. According to their Response, the Plaintiffs estimated the detention to have been approximately thirty-five (35) minutes long. The Plaintiffs' timeframe matches that which was reported in the Tunica County Sheriff's Office Radio Station Log, submitted by Defendant with the Motion. [12, Ex. 3].

### B. Facts Allegedly Subject to Dispute

The primary issue, distinguishing the Plaintiffs' version of events from that of the Defendant, is whether, at the time of the stop, the Defendant knew that Marcus Starks supposedly did not own the vehicle involved or that the license plate displayed incorrect tags. Defendant claims that at the time of the stop, he discovered that the plates on the car driven by Marcus Starks were actually registered to "Aaron Warhurst" or "Sandra Irby." [13]. Further, the plates were registered for a black, 1990 Ford, whereas the car Marcus Starks was driving was a white, Chrysler 300. [13]. Deputy Keys asserts that upon learning this information, he had the right to further detain the car and passengers, and to inspect their licenses.

Plaintiffs do not appear to dispute that the inconsistent tags would have provided the Defendant with the requisite reasonable suspicion to further detain the car and to check the licenses of all passengers. Instead, Plaintiffs allege that Defendant did not actually know of any problems with the car tags at the time of the stop but instead that that defense was fabricated

4

after the fact. The history of the problems with Marcus Starks's car plates is a somewhat tangential story, though one which must be addressed in an effort to view the evidence in the light most favorable to the non-moving party, the Plaintiffs.

While driving his Chrysler 300 in Horn Lake, Mississippi, in December, 2014, approximately two months after the stop in question, Marcus Starks was again stopped by a police officer, who noticed that his license plate design had expired even though the sticker on the plate was current. The officer charged Marcus with using a switched tag. Prior to his trial date on that charge, Marcus investigated the matter at the Desoto County Tax Collector's Office and learned that an employee of that office had erroneously given him a license sticker or decal when she should have given him a replacement license plate. Marcus obtained the correct plate, DCP 877, and on April 7, 2015 the court dismissed the charge with the comment, "...was issued in error by the tax office." This discovery of the license plate mix-up serves as the basis for the Plaintiffs' theory of events and liability. As stated in their Response:

> At some time apparently after the conclusion of the traffic stop, and probably not prior to the filing of this lawsuit, someone read the dispatcher's contemporaneous notes of the stop, including the result of his having run a computer check on the Chrysler's license plate, Desoto County, Mississippi plate DEC 471. That information was presented to defense counsel, as indicated by the quoted dispatch notes at the top of page 2 of the defense brief in support of the summary judgment motion. Those notes indicate that license plate DEC 471 was registered to a different vehicle belonging to two individuals who were not in the Starks vehicle. This information was true, but misleading, as will be discussed below.
> Upon learning about the dispatcher's notes concerning his license plate, DEC 471, after receiving the motion for summary judgment, Marcus Starks revisited the history of his license plates at the office of the County Tax Collector. As shown in his Declaration, P-3, and Collective P- 2 [2 pages]), the plate DEC 471 was indeed the plate issued to him at the time of his purchase of the vehicle in 2009, and which at the time of the traffic stop was still displayed on the vehicle. On July 11, 2014, he should have received a new license plate numbered DCP 877, but the office employee erroneously gave him only an updated decal instead. Thus, he retained license plate DEC 471, but with a new decal. The proper, but erroneously undelivered tag had an expiration date of April 30, 2015. When he

5

> was stopped by Defendant Keys on October 24, 2014, Marcus was still unknowingly displaying an obsolete tag, albeit with a current decal.
> 
> Obviously, no one discovered this at the time of the traffic stop at issue, and Marcus was allowed to leave with just a citation for "no seatbelt". Meanwhile, Marcus' old tag number of DEC 471 had been reassigned to a different vehicle owned by two other people, as reflected in the dispatcher's notes.

[18].

In short, Plaintiffs do not believe that Deputy Keys knew of the license plate mistake at the time of the stop in question, and did not actually have a reasonable suspicion to detain the vehicle past the original legitimate purpose. Instead, Plaintiffs appear to infer that the Defendant is now fabricating a pretext with information obtained after the fact. For the reasons set forth below, however, the Court finds this claim to not only be an unsubstantiated theory, but to be directly contradicted by the evidence presented. Further, the Court finds that there existed additional grounds on which to prolong the stop. Accordingly, the Court finds that there is no genuine issue of material dispute and that the Defendant is entitled to summary judgment as a matter law.

### III. CONCLUSIONS OF LAW

Summary judgment is appropriately granted when the evidence shows that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists where a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A court considering a motion for summary judgment must construe the facts and evidence in the light most favorable to the nonmoving party. *Ford, Bacon & Davis, LLC v. Travelers Ins. Co.*, 635 F.3d 734, 736 (5th Cir. 2011). If the party seeking summary judgment meets its initial burden, the nonmoving party must then counter "with specific facts showing a genuine factual issue for trial." *Harris ex rel. Harris v. Pontotoc Cnty. Sch. Dist.*, 635 F.3d 685, 690 (5th Cir.

6

2011). The nonmovant cannot rely on metaphysical doubt, conclusive allegations, or unsubstantiated assertions but instead must show that there is an actual controversy warranting trial. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). "[A] a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 317, 106 S. Ct. 2548, 2550, 91 L. Ed. 2d 265 (1986).

Defendant has filed this Motion based on a defense of qualified immunity. [12]. Qualified immunity shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was '"clearly established"' at the time of the challenged conduct." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023, 188 L. Ed. 2d 1056 (2014) (citing *Ashcroft v. al–Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011)).

> This court applies a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity. First, we determine whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights." If the evidence viewed in the light most favorable to Appellees demonstrates that a constitutional violation occurred, "we next consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question.

*Freeman v. Gore*, 483 F.3d 404, 410–11 (5th Cir. 2007).

**A. Whether Defendant Violated Plaintiffs Constitutional Rights**

For the reasons set forth below, the Court finds that the Defendant did not violate Plaintiffs' Fourth and/or Fourteenth Amendment rights to be free from unreasonable search and seizure.

The Fourth Amendment guarantees:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. I.

For the purposes of the Fourth Amendment, a traffic stop constitutes a seizure of the driver and any passengers in a vehicle. *Brendlin v. California,* 551 U.S. 249, 257–58, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007).[7] "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 1772, 135 L. Ed. 2d 89 (1996).

"Pursuant to *Terry,* the legality of police investigatory stops is tested in two parts. Courts first examine whether the officer's action was justified at its inception, and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (citing *Terry v. Ohio*, 392 U.S. 1, 19-20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889 (1968)). "An officer's

---

[7] A traffic stop also constitutes a seizure of the passengers, not just the driver, for Fourth Amendment purposes. *Brendlin*, 551 U.S. at 257 (holding that "[a] traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver, diverting both from the stream of traffic to the side of the road, and the police activity that normally amounts to intrusion on 'privacy and personal security' does not normally (and did not here) distinguish between passenger and driver.").

subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, *unless he develops reasonable suspicion of additional criminal activity in the meantime*. *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010) *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010) (emphasis supplied).

In the case currently before this Court, it is undisputed that the Defendant had probable cause to believe that a traffic violation occurred – in this case, that Marcus Starks was driving without wearing his seatbelt. Accordingly, the first prong of the two-part test articulated in *Terry* is satisfied. The point of contention, instead, (concerning prong two) is whether the Defendant had probable cause to continue to detain the vehicle, after the seat belt citation was issued. Upon consideration of all facts and evidence, the Court finds that the Defendant did develop reasonable suspicion of criminal activity in the course of the stop.

### 1. Driver's License and Registration did not Match

There is no question that "an officer may examine driver's licenses and vehicle registrations and run computer checks as part of his investigation of the circumstances that originally caused the stop." *Pack*, 612 F.3d at 350. Accordingly, when Depute Keys ran the license and registration presented by Marcus Starks, he was operating well within defined parameters. When Deputy Keys ran that information, he discovered that the license plate did not match the description of the car before him, nor was "Marcus Starks" the name listed on record. Thus, although the stop was originally made for a seatbelt violation, the discovery of this new information, obtained during the lawful course of the stop, gave rise to a new "thread" of reasonable suspicion. It is objectively reasonable for the Defendant to have found the inconsistent name and vehicle description suspicious, and to consider the realm of possible

explanations for this discrepancy, including that Marcus Starks may have been unlawfully operating the vehicle.

Upon discovery of the information in question, it became reasonable for the Defendant to inspect the passengers' information as well. The Fifth Circuit "has consistently approved a police officer's questioning a driver's travel plans where the driver was not the authorized vehicle lessee or otherwise appeared to lack driving authority." *Brigham*, 382 F.3d at 508. Further, "the Fourth Amendment permits '[a] police officer [to] undertake similar questioning of the vehicle's occupants to verify the information provided by the driver.'" *Id*. (quoting *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002). Because "Marcus Starks" was not the name on record associated with the license plates and registration, Defendant's expansion of questioning to include the car's passengers was not unreasonable. Although further investigation into the inconsistency may have prolonged the stop past what was necessary to address the seatbelt violation, "…a traffic detention may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, *that emerges during the stop*." *Brigham*, 382 F.3d at 512 (emphasis suppled).

As stated above, Plaintiffs reject this idea that Defendant prolonged the stop based on information discovered during the course of the stop, based on their belief that Deputy Keys did not know that there was any inconsistency with the registration. Plaintiffs predicate this argument on the basis that Defendant did not tell the Plaintiffs, at the time of the stop, that the registration did not match the plaintiff's name. [17, Ex. 3, 4, and 5]. As Plaintiffs further point out, no reference to the license plate inconsistency was made in the incident report, or any of the deputies' affidavits, including Defendants. [12, Ex. B, D, E, F, G, and H]. Plaintiffs argue that

Defendant did not request to check passengers' licenses based on the registration inconsistencies, but because he was attempting to conduct a general criminal investigation of the passengers, attempting to determine if they had outstanding warrants.

However, the evidence presented contradicts Plaintiffs' theory. Along with the Motion, Defendant has submitted the Tunica County Sheriff's Office Radio Log from the night in question. [12, Ex. C]. On page 11 of the document, there is an entry made at 10:20 P.M., showing the license plate number from the Plaintiffs' car, with the notation "Aaron Warhurst or Sandra Irby 1990 Ford Black." Plaintiffs, in their pleadings, have no adequate response to this piece of evidence. Plaintiffs simply state "it is patently obvious that the dispatch was not read, and therefore certainly not relied upon to justify a demand to run the driver's licenses of the passengers" and that "the dispatch obviously got lost in the confusion of the moment." [18].

Pursuant to the rules of summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L. Ed. 2d 176 (1962) *(per curiam)*. Toward that end, the Court accepts Plaintiffs' account of the stop, including the assertion that Defendant did not mention the inconsistency with the license plates. However, the mere fact that Defendant may not have adequately explained his process, or may have completed a sub-par incident report, does not mean that Defendant did not know of the inconsistency. Rather, the fact that the names "Aaron Warhurst or Sandra Irby 1990 Ford Black" appear in Radio Log, *made at the time of the stop*, appears to directly defeat Plaintiffs' theory. The Court finds that it would be simply impossible for the Plaintiffs to know whether Defendant heard the dispatch or not, and likewise impossible to prove. Although the Court gives deference to a nonmovant at the summary judgment stage, it is

also true that the nonmovant "cannot rely on metaphysical doubt, conclusive allegations, or unsubstantiated assertions." *Little*, 37 F.3d at 1075.

Finally, in regards to the argument that Defendant was merely trying to conduct an impermissibly general criminal investigation, the Court finds that there is a similar dearth of evidence to plausibly support this theory – it is instead only the Plaintiffs' unsubstantiated assertion. The mere fact that the officers may have run the information of the passengers, and then reported back that none retuned outstanding warrants, does not prove Plaintiffs' theory that Defendant's actions were *only* based on a desire to fish for warrants. Further, U.S. Supreme Court case law is clear that the Constitutional reasonableness of a traffic stop does not depend on the actual motivations of the individual officers involved. *Whren*, 517 U.S. at 813. Thus, even if Defendant also had an additional, or ulterior, motive in mind, his actions – otherwise supported by a reasonable suspicion acquired during the course of the stop – are not automatically rendered unconstitutional.

2. **Plaintiffs Consensually Prolonged the Stop**

Although the Court is careful not to imply that individuals should disregard what they perceive to be violations of their individual rights, the Court would be remiss to not mention that the stop in question appears to have been prolonged primarily at the Plaintiffs' request to speak to Defendant's supervisor, Captain Felix. As the Radio Log shows, and the affidavits confirm, Captain Felix was called to the scene at approximately 8:27 P.M. [12, Ex. C, G]. According to the affidavit of Deputy White, who placed the call, Captain Felix responded at 8:34 P.M. that he had finished his last assignment and was en route to the stop. [12, Ex. G]. He eventually arrived at 8:42. *Id*. By 8:49 P.M., all passengers' licenses were run through dispatch (coming back negative for outstanding warrants), and by 8:55 P.M. the traffic stop was completed. *Id*.

The Fifth Circuit has previously recognized that a consensually prolonged encounter does not amount to a violation of Fourth Amendment rights. *Brigham*, 382 F.3d at 508 (holding that "this court has recently noted that a consensual interrogation may follow the end of a valid traffic stop and that such consensual encounters do not implicate Fourth Amendment concerns."); *United States v. Sanchez-Pena*, 336 F.3d 431, 442 (5th Cir. 2003)(noting that in *United States v. Brown*, 102 F.3d 1390, 1394–97 (5th Cir. 1996), *overruled in part on other grounds, United States v. Brown,* 161 F.3d 256 (5th Cir. 1998), the court rejected the defendant's argument that an officer must inform a motorist that the legal detention has concluded before the officer can engage in consensual interrogation and request to search the vehicle.). Although this Court does not chastise Plaintiffs for requesting confirmation from a supervising officers, it would be hard to ignore the reality that of the thirty-five minute stop, fifteen of those minutes, close to half of the encounter, were spent calling on and then waiting for Captain Felix to arrive, based on the Plaintiffs' own request. That fact only serves to undermine the allegation that the scope and duration of the stop was unreasonable under the circumstances.

3. **Plaintiffs' Behavior at Time of Stop**

Finally, this Court considers whether the Defendant had any additional basis for detaining the Plaintiffs and their passengers. According to both parties' accounts of the incident, when Marcus Starks was first pulled over, he failed to place the car in park, causing it to begin to roll forward as the officers were approaching. [12, Ex. B][17, Ex. 4]. Defendant also stated in his incident report that during the course of the stop, Marcus Starks became agitated and angry. [12, Ex., B].

The reasonable duration of a traffic stop "is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, *and attend to related safety concerns*."

13

*Rodriguez v. United States,* —U.S. —, 135 S. Ct. 1609, 1614, 191 L. Ed. 2d 492 (2015) (citations omitted)(emphasis supplied). Although the Plaintiffs assert that the car only rolled forward because Marcus Starks forgot to place it in park before reaching for his wallet and registration – and the Court accepts that that may very well have been the case – it also notes that it would have been impossible for the Defendant to have known, at the time, that that was the reason for the car's movement. Instead, that action, coupled with Marcus Starks's allegedly agitated behavior, reasonably put the attending officers on alert. Accordingly, the duration of the stop was reasonable in light of the need to attend to legitimately perceived safety concerns. This is all the more true when one also considers the above-mentioned factors and concerns (including the inconsistent registration, and the Plaintiffs' request for a supervisor to attend to the stop).

**B. Whether Defendant's Actions Were Objectively Unreasonably in Light of Clearly Established Law**

Whether an officer violated an individual's Constitutional right is a threshold inquiry into whether an officer is entitled to qualified immunity. As this Court has concluded that the Plaintiffs' rights were not violated, in that the seizure in question was not unreasonable, this Court does not reach this second prong.

**IV. CONCLUSION**

The parties do not dispute that Defendant had a legitimate and lawful purpose in stopping the Plaintiffs' vehicle when it was observed that Marcus Starks was not wearing his seatbelt. A traffic stop such as this constitutes a detention which must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges. *United States v. Dortch*, 199 F.3d 193, 200 (5th Cir. 1999) *opinion corrected on denial of reh'g,* 203 F.3d 883 (5th Cir. 2000); *United States v. Machuca–Barrera,* 261 F.3d 425, 434 (5th Cir. 2001). In cases such as the one presently before this Court, District

14

Courts are charged "to consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." *Brigham*, 382 F.3d 500, 507 (5th Cir. 2004).

Upon consideration of the totality of the facts and circumstances, including (1) the problems with the license plates and registration, (2) that approximately half of the stop was attributed to waiting for Captain Felix to arrive, whose presence was requested by the Plaintiffs, (3) what officers may have perceived as suspect behavior on the part of the Plaintiffs, and (4) that the entire stop lasted thirty-five minutes, the Court finds that the duration of the stop was reasonable. As the Fourth Amendment only guarantees individuals to be free from *unreasonable* searches and seizures, the Court finds that no Fourth Amendment violation has occurred, and that the Defendant is entitled to a defense of qualified immunity, for summary judgment to be granted, and for the case to be dismissed. Accordingly, it is hereby,

ORDERED that the Motion for Summary Judgment [12] is GRANTED and this case DISMISSED.

A separate judgment will be entered on this date, pursuant to Federal Rule of Civil Procedure 58.

SO ORDERED this the 28th day of March, 2016.

>**/s/ MICHAEL P. MILLS**
>**UNITED STATES DISTRICT JUDGE**
>**NORTHERN DISTRICT OF MISSISSIPPI**